## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
### www.flsb.uscourts.gov

In re:

CLSF III IV, INC., *et al.*,

      Debtors.

_____/

DEBORAH C. MENOTTE, CHAPTER 7
TRUSTEE,

      Plaintiff,

v.

SUNSTAR FINANCIAL, LLC; and REED
COLLINGWOOD,

      Defendants.

_____/

Lead Case No. 12-30081-EPK
Chapter 7

Substantively Consolidated

Adv. No.: _____-EPK

## COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS

Deborah C. Menotte ("Plaintiff" or "Trustee"), the duly appointed and acting Chapter 7

Trustee for the bankruptcy estates of CLSF III IV, Inc., *et. al.* ("Debtors"), by and through her

undersigned counsel, and pursuant to Sections 544, 548, 549 and 550 of the Bankruptcy Code,

11 U.S.C. §§ 101-1532, and applicable state law, sues the Defendants, Sunstar Financial, LLC,

and Reed Collingwood, to avoid and recover fraudulent transfers and post-petition transfers, and

in support, alleges:

## NATURE OF ACTION

1.      This adversary proceeding, along with the underlying bankruptcy proceedings

of the numerous substantively consolidated Debtor and non-Debtor entities, arises from a life

settlement scheme ("Quality Investments Scheme") with components in the United States and

various European countries.  The Quality Investments Scheme was primarily orchestrated by

Dennis Edward Moens ("Moens").  Moens utilized Simon Franciscus Wilhelmus Laan ("Laan") as the public face of the scheme in Europe for sales and marketing, and Deborah C. Peck, an attorney admitted only in New Jersey, as the Florida trustee purportedly ensuring the security of the underlying life insurance policies.  Each played a part in creating the illusion that the Quality Investments Scheme was a legitimate opportunity for Europeans, primarily in Belgium and the Netherlands, to safely invest in life insurance policies on the lives of elderly Americans.

2.      In reality, the Quality Investments Scheme was a massive fraud.  One component of the fraud was the promotion of investments in Dutch life settlement funds ("Funds", each a "Fund") to investors in Europe.  Each Fund would have participation interests of varying amounts which could be purchased by the investors.  Each Fund was then supposed to be made the beneficiary of a Florida trust that purchased a life insurance policy ("Policy" or "Policies") on an elderly American which the Trust would own.  Peck was to be the trustee for each of these Florida trusts ("Trusts", each a "Trust").  Each Policy was ultimately transferred to a corporation ("Corporations", each a "Corporation"), with each Corporation then owning the respective Policy, with the Trust as sole shareholder and Peck as the principal.

3.      Peck would oversee each of the Trusts and use bank accounts, part of the attorney escrow, trust and IOLTA trust accounts and subaccounts ("Accounts") operated and administered by her under her law firm, Deborah C. Peck, Esq. PA. ("Peck PA") to provide a false sense of respectability and protection for monies paid by investors for their investments in the Funds.  The investors were directed to wire the monies they paid for their participation interests in the Funds and other related costs to the Accounts.

4.      The hundreds of millions of dollars in investor monies wired into the Accounts were comingled, with no accounting of monies by any individual Trust or Corporation, or for

which Policies the respective payments were made.  Further, no concern was given as to the excessive amounts paid to purchase Policies, since Peck, her husband, various insurance providers and agents, as well as Moens and Laan, unduly benefited from every transaction.

5.      As the second component of the Quality Investments Scheme, Moens utilized the monies in the Accounts as a virtual piggy bank to make thousands of fraudulent transfers to, or for the benefit of, himself, Laan and Peck.  The vast majority of these transfers went to, or for the benefit of Moens, and/or his alter ego entities, Watershed, LLC ("Watershed"), Running2 Limited, LLC, Crystal Life International FZE a/k/a Crystal Life Capital, S.A. ("Crystal Life"), and Zilwood, S.A. (collectively "Moens Alter Ego Entities", each a "Moens Alter Ego Entity"). Numerous transfers also went to, or for the benefit of Laan, and/or to entities controlled by Laan, namely Quality Investments B.V., Quality Investments Belgium B.V.B.A., Quality Investments Nederlands B.V., and Quality Investments International A.G., (collectively the "QI Entities", each a "QI Entity").

6.      At all times pertinent hereto, a Moens Alter Ego Entity is referred to as such because Moens was the alter ego of all respective entities described in the foregoing paragraph, given that Moens: (a) personally thoroughly dominated and controlled each such entity as to decision making and use of moneys, with no independent person involved in the entity who could otherwise prevent Moens from taking any action, including the illegal actions described throughout this complaint; (b) created such entity for the sole purpose of using that entity not only as a corporate buffer to insulate him for the personal liability he was incurring in connection with the fraud described herein, but further, to use such entity as an actual direct participant in the commission of the fraud; (c) utilized the entity solely for his own personal financial

purposes; and, (d) upon information and belief, Moens disregarded corporate formalities for all such Moens Alter Ego Entities.

7.      None of the transfers to, or for the benefit of, Moens, Laan, the Moens Alter Ego Entities, or the QI Entities provided benefit to the Debtors.  As a result of these transfers, as well as the comingling of investor monies and the lack of accounting by any individual Trust or Corporation, the Debtors were insolvent from day one.  Ultimately, after Moens and Laan were arrested and unable to bring in new investors, it became apparent that there were insufficient funds remaining in the Accounts to maintain the Policies owned by the Debtors.  This resulted in the lapse of many Policies and the loss of hundreds of millions of dollars.  The vast majority of claimants in the Debtors' bankruptcy cases were investors in the Quality Investments Scheme.

## JURISDICTION AND VENUE

8.      This adversary proceeding seeks to avoid and recover fraudulent transfers pursuant to sections 544, 548 and 550 of the Bankruptcy Code and applicable state law.

9.      This Court has jurisdiction to hear this lawsuit pursuant to 28 U.S.C. § 1334(b).

10.     Pursuant to 28 U.S.C. § 157(b)(2)(H) this lawsuit is a core proceeding which the Court may hear, but, per United States Supreme Court precedent, it is not one in which this Court may enter judgment without the consent of all parties.

11.     The Plaintiff consents to this court determining the cause and entering final judgment thereon, and if the Defendant demands a jury trial, the Plaintiff consents to this Court conducting it.

## PARTIES

12.     Plaintiff, Deborah C. Menotte, is the duly appointed permanent Chapter 7 Trustee for the bankruptcy estate of the substantively consolidated Debtors.

13.     Defendant, Sunstar Financial, LLC ("Sunstar") is Washington limited liability company whose principal place of business is in Bellevue Washington.

14.     Defendant Reed Collingwood ("Collingwood") resides in Arizona, but claims to be a citizen of Washington. Reed Collingwood is the principal of Sunstar.

## PROCEDURAL BACKGROUND

15.     On August 22, 2012 ("Initial Petition Date"), the above-captioned bankruptcy case was commenced by the filing of an involuntary petition for relief in this Court under Chapter 7 of the Bankruptcy Code.

16.     Thereafter, between October 24 and November 7, 2012, thirty-two affiliates ("Affiliates") of the Debtor filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code.

17.     On December 11, 2012, the Chapter 7 cases of the Debtor and the Affiliates were jointly administered.

18.     On October 2, 2013, this Court entered an order [Main Case ECF No. 561] approving the substantive consolidation of the bankruptcy estate of CLSF III/IV, Inc. with that of the bankruptcy estates of the thirty-two Affiliates and numerous non-debtor entities ("Non-debtor Entities").

19.     December 19, 2013, this Court entered an order [ECF No. 649] clarifying that, (i) with respect to the Non-debtor Entities, including CLSF XXXIX Corporation, the petition date was September 25, 2012 for all purposes, and (ii) with respect to the Debtors, the effective petition date was the actual date of the filing of the respective voluntary or involuntary petition for each Debtor.

20.     On August 6, 2014, this Court entered an order [Main Case ECF No. 857] approving the substantive consolidation of the bankruptcy estate of debtor Deborah Catherine Peck, and the estate of non-debtor entity Deborah C. Peck, Esq., PA ("Peck PA") with the previously substantively consolidated Debtors, and providing that the effective petition date for Peck PA was September 25, 2012 ("Petition Date").

## BACKGROUND FACTS

21.     Each of the Debtors, as well as the substantively consolidated Non-debtor Entities, began and was operated in a virtually identical way:  Investors in the Funds wired money into the Accounts operated and administered by Peck under her law firm, Peck PA.  All investor monies were deposited into the Accounts.

22.     Watershed, through Moens, would direct Peck on the use and distribution of the monies in the Accounts.  Certain monies in the Accounts were used to purchase the Policies through providers in the United States that had licenses to buy and sell these Policies.

23.     Watershed, through the QI Entities, packaged the Policies for sale, with what was the third major component in the Quality Investments Scheme:  purported reinsurance policies.  This reinsurance was essentially a purported bond which guaranteed that, if the insured was still alive after a certain named period of time (typically 3-5 years), the reinsurance company would pay the investors the face amount of the Policy and acquire the Policy in exchange.  This reinsurance component was designed to provide comfort to the investors that they would receive the return promised on their investment within a set period of time, either through the death of the insured or through the reinsurance policy.  Unbeknown to the investors, but well known to Moens and Laan, the reinsurance company utilized by Moens and Laan was itself, as discussed below, a scam.  In reality, there were no reinsurance bonds backing any of the investments.

24.    The QI Entities, managed by Laan, structured the Funds, then marketed and sold interests in the Funds as investments to the European investors.  Each of the investors purchased a fractionalized non-transferable participation interest in one or more of the Funds.

25.    Laan was the front man for the Quality Investments Scheme, marketing the sale of participation interests through QI to investors, primarily in the Netherlands and Belgium.  He appeared in numerous magazine articles in Europe touting the benefits of investing in life insurance policies on the lives of elderly Americans.

26.    The investments sold by QI were organized into two types of closed life settlement funds, one organized under Dutch rules and law ("CLSF Funds"), and the other organized under Belgian rules and law ("BGI Funds").  Each Fund had an agreement that governed the members' involvement in that particular fund and a participation agreement through which investors would purchase an interest in the Fund.  Investors were given a prospectus with regard to the Fund investments.

27.    Each of the Trusts was created to hold a Policy as both owner and beneficiary of that Policy.  Further, each Fund was to be a beneficiary of one of the Trusts.

28.    Each Trust purchased a Policy, typically structured through Watershed or, at times, Crystal Life, in order for Moens to extract additional monies from the Accounts.

29.    Although Watershed never took actual title to the Policies, and never used its own money to purchase the Policies, it "sold" each of the Policies to separate Trusts, each with Watershed designated as trustor/settlor and Peck as trustee.  Over 55 separate Trusts were formed, each of which at some point owned a Policy.  The beneficiary of each individual Trust was a CLSF Fund or BGI Fund in which the foreign investors had purchased participation interests.  These Trusts are included in the Non-debtor Entities.

30.    Watershed was not a "licensed provider" entitled under any state law regulations to purchase a life insurance policy directly from an insured without having an insurable interest in that insured.  Moens and Watershed initially utilized licensed providers, primarily Parcside Equity, LLC ("Parcside") to buy the Policies directly from insureds in the United States.  In the instances where Parcside acted as a licensed provider in the acquisition of Policies, both Parcside and Watershed received unreasonably large, unjustified payments of money from the Accounts, in amounts which were several times the amounts paid to the insureds for the purchase of the Policies, and Parcside itself paid significant commissions and fees to Watershed and to Peck's husband, Joe Kelly "Kel" Bloomer.

31.    The licensed provider would purchase the Policy from an insured, prepare transfer documentation from the insured to the provider, prepare transfer documentation from the provider to Watershed, execute the document which purported to sell the Policy from the provider to Watershed, and prepare transfer documentation from Watershed to a Trust.

32.    In almost all of the Policy acquisitions through a licensed provider, Peck would wire money from the investor moneys held in the Accounts to the provider for the supposed sale of the Policy to Watershed, then turn around and pay money from the Accounts to Watershed for the purported sale of the Policy from Watershed to a Trust at a steep mark-up.

33.    Near the end of the Quality Investments Scheme, Watershed also utilized Defendant Sunstar, which was not a licensed provider, nor a broker licensed in Florida, in the purchase of Policies.  Sunstar was a mere intermediary and not entitled to commissions on the Policies.  Notwithstanding, Sunstar received numerous large payments directly from the Debtors' Accounts that were ultimately shared with Peck's husband, Kel Bloomer.  Payments for these Sunstar-related Policies went directly from the Debtors' Accounts to the sellers of the Policies.

34.     Upon information and belief, no money used to procure any Policy came directly from Moens or Watershed; rather, all of the money used to purchase Policies came from the money wired to the Accounts by European investors as participants in the Funds.

35.     Peck, an attorney admitted only in New Jersey, lived in Florida and, from 2005 forward, worked as trustee for all of the Trusts out of an office in Florida.

36.     Peck entered into trust agreements establishing the Trusts as grantor trusts under Florida law, with Peck as Trustee and, typically, Watershed as grantor, trustor and/or settlor. Peck, in her capacity as trustee for each of the Trusts, initially purchased and held an interest in the Policies as owner and beneficiary.

37.     Subsequently, in a stated effort to shield the European investors from United States tax obligations, Peck transferred some of the Policies owned by the Trusts to numerous distinct Florida Corporations.    In each such transfer, the transferring Trust became the shareholder of the Corporation, and the Corporation then issued a promissory note to the Trust from which a Policy had been transferred for the face value of that particular Policy.

38.     The Corporations, along with the Trusts, Peck PA, and Peck's individual bankruptcy estate, comprise the substantively consolidated "Debtors".

### Reinsurance Bonds – A Key Component of the Fraud

39.     The company utilized by Moens and Laan for the purported reinsurance bonds was Provident Capital Indemnity, Ltd. ("PCI"), a company believed to have been domiciled in the Commonwealth of Dominica.  To prevent investors in the Funds from discovering that PCI and its reinsurance bonds were yet another scam, Moens directed Peck to utilize monies in the Debtor Accounts to pay monies due on PCI reinsurance bonds on policies purchased by non-Debtor third parties unrelated to any of the Funds ("Third Party Policies").

40.     The payments from the Accounts as "payoffs" of reinsurance bonds for Third Party Policies provided no benefit whatsoever to the Debtors.  These payments were ordered by Moens so that it would appear that PCI was a legitimate company, thereby perpetuating the Quality Investments Scheme.  None of the pay-outs on PCI reinsurance bonds by Peck from the Debtors' Accounts were for the Debtors' Policies.  All of the reinsurance bonds paid from the Accounts were on Third Party Policies.

41.     None of the monies utilized to pay out the PCI reinsurance bonds came from PCI.  All the monies came from the Debtor Accounts.  No monies were ever sent from PCI to the Debtors to pay the obligations of PCI on the reinsurance bonds.

42.     Moens directed Peck to pay out the PCI bonds on the Third Party Policies solely to keep alive the pretense that reinsurance bonds existed on the Policies in order to perpetuate the Quality Investments Scheme.

43.      Five of the Third Party Policies for which Moens directed Peck to utilize monies from the Accounts to pay PCI reinsurance bonds were for investors in funds ("LSF Funds") established by Moens and Laan through their business enterprises, Best Invest and VieVestment, whose operations preceded, but were akin to, the Quality Investments Scheme. The monies paid by investors into the LSF Funds never went into the Accounts (which had not yet been established), yet all of the monies to pay the PCI reinsurance bonds on the LSF Funds came from the Accounts.

44.     At Moens' direction, Peck paid out over $16 million to investors in the LSF Funds in purported payment of the PCI reinsurance bonds.

45.     Further, solely upon the direction of Moens and Watershed, Peck also paid out more than $10 million from the Accounts in payment of PCI reinsurance bonds on additional Third Party Policies.

46.     On January 19, 2011, the United States Securities and Exchange Commission initiated a civil enforcement action against PCI and its principals, Minor Vargas Calvo and Jorge L. Castillo, alleging that the defendants, through the sale of reinsurance bonds to life settlement companies, had committed securities fraud on a massive scale in violation of federal law.

47.     In April 2012, Vargas was convicted, and eventually sentenced to 60 years in prison for, as stated by the United States Attorney, "masterminding a criminal reinsurance company that fraudulently claimed to guarantee almost half a billion dollars of life settlement investments to thousands of investors worldwide."

### Moens, Through Peck, Controlled the Transfers from the Accounts

48.     All monies received from European investor participations in the Funds were deposited into the Accounts, and all disbursements and transfers were made from those Accounts.

49.     None of the Trusts or Corporations ever had its own separate bank account.

50.     Peck was the sole officer and director of the Corporations, the sole trustee of the Trusts and the sole owner of Peck PA.  Peck managed and controlled the Accounts under the direction of Moens.

51.     According to Peck, Moens would direct her as to what transfers to make from the Accounts and for what purpose and she would make those transfers.

52.     Moens exercised actual control over the Moens Alter Ego Entities and also exerted control over Laan's activities with the QI Entities.

53.     All transfers by the Debtors to the Moens Alter Ego Entities and the QI Entities were for the benefit of Moens.

54.     All transfers by the Debtors to the QI Entities were made either on behalf of Watershed or as a commission payment on behalf of Watershed.  Hence, all transfers to the QI Entities were for the benefit of Watershed and, consequently, Moens.

55.     Further, all transfers by the Debtors to the QI Entities directly were for the benefit of both Moens and Laan by keeping the Quality Investments Scheme afloat.

56.     Peck, primarily at the direction of Moens and Watershed, (i) caused the Trusts to substantially overpay for the Policies; (ii) commingled funds held in the Accounts; (iii) paid excessive monies to Moens, Laan, herself and others; (iv) paid excessive monies to third parties for the benefit of Moens, Laan, herself and others; (v) made purchases and disbursements which had no reasonable relationship to the operation of the Trusts or the maintenance of the Policies; and (vi) allowed numerous Policies to lapse.

57.     As a result of Peck's conduct, and the transfers of many millions of dollars to, or for the benefit of, Moens, Laan, the Moens Alter Ego Entities, and the QI Entities, there were insufficient funds to maintain the Policies owned by the Debtors, causing many Policies to lapse, and ultimately causing the loss of hundreds of millions of dollars

## ALLEGATIONS SPECIFIC TO DEFENDANTS

58.     Sunstar is not a licensed provider of life settlement policies.

59.     Upon information and belief, neither Sunstar nor Collingwood were licensed brokers in the relevant states at the time they were involved with the purchase and sale of Policies by the Debtors.

60.     Because neither Sunstar nor Collingwood were licensed brokers or providers, they were not entitled to receive any commissions in connection with the purchase or sale of life

insurance policies. Nonetheless, Sunstar and Collingwood received over $1.4 million in "consulting fees" or commissions from the Debtors in connection with the purchase of several of the Policies.

61.    All monies paid to Sunstar came from the Debtors' Accounts.

62.    No monies paid to Sunstar had any direct correlation to the purchase or sale price of the Policies.

63.    Sunstar and Collingwood caused the Debtors to pay excessive amounts for the purchase of the Policies, while charging excessive amounts in purported "commissions" on these purchases.

64.    The purported "commissions" paid to Sunstar were grossly in excess of the normal 1-2% range to which a licensed provider, or a licensed broker, might be entitled in the life settlements industry.

65.    Moreover, Sunstar and Collingwood were not entitled to receive any "commissions" pursuant to regulations which govern the sale of life insurance policies.

### Pre-Petition Transfers

#### Transfers Prior to the Initial Petition Date

66.    Prior to the Initial Petition Date, between August 22, 2008 and August 22, 2012, the Debtors made wire transfers in the total amount of $1,404,000.00 directly to Sunstar ("Pre-Initial Petition Date Transfers").  A list of the Pre-Initial Petition Date Transfers is attached as **Exhibit "A"** hereto.

#### Transfers Prior to the September 25, 2012 Effective Petition Date

67.    The effective petition date in regard to the sale of specific Policies is as provided in the Court's December 19, 2013 order [ECF No. 649].  Pursuant to that order, the

effective petition date for Non-debtor Entities is September 25, 2012 ("Effective Petition Date").

68.    Prior to the Effective Petition Date, on September 13, 2012, the sum of $156,371.81 was wired to the escrow account of attorney Arthur Feuerborn for the purchase of a Policy from the Debtors on the life of the insured, Gluck.  On the following date, September 14, 2012, Feuerborn transferred $55,547.81 ("September 14 Transfer") of this sum to Sunstar. Sunstar had no entitlement to receive these funds, which were funds of the Debtors.  Feuerborn was a mere conduit and not the initial transferee of the September 14 Transfer.  An accounting of the September 14 Transfer is contained in **Exhibit "B"** attached hereto.

69.    All transfers to Sunstar prior to the Initial Petition Date and the Effective Petition Date (collectively, "Pre-petition Transfers") were also for the benefit of Collingwood.

70.    Sunstar and Collingwood provided no value or benefit to the Debtors for the Pre-petition Transfers.

**Post-petition Transfer**

71.    On November 1, 2012, after the Effective Petition Date, the sum of $435,732.94 was wired to Feuerborn for the purchase of a Policy from the Debtors on the life of insured, Rosenberg.   On the following day, November 2, 2012, Feuerborn transferred $146,250.00 of this sum to Sunstar ('Post-petition Transfer").  A detailing of the Post-petition Transfer is contained in **Exhibit "B"** hereto.

72.    The Post-petition Transfer was made without authorization of this Court.

73.    The Post-petition Transfer to Sunstar was also for the benefit of Collingwood.

74.    Sunstar and Collingwood provided no value or benefit to the Debtors for the Post-petition Transfer.

## COUNT I- FRAUDULENT TRANSFER
## <u>PURSUANT TO SECTION 548(a)(1)(A)OF THE BANKRUPTCY CODE</u>

75.     Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

76.     The Debtors made Pre-petition Transfers to, or for the benefit of, the Defendants within the two year period prior to the Initial Petition Date and the Effective Petition Date ("Two Year Transfers").  The dates and amounts of the Two Year Transfers are listed in attached **Exhibit "C",** save for the September 14 Transfer, which is included in **Exhibit "B".**

77.     The Two Year Transfers constituted the transfer of an interest of the Debtors in property.

78.     The Debtors made the Two Year Transfers with the actual intent to hinder, delay or defraud an entity to which the Debtors were or became, on or after the date such transfers were made, indebted.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a Judgment:

a.     Declaring the Two Year Transfers to have been fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code;

b.     Avoiding the Two Year Transfers as fraudulent transfers in violation of Section 548(a)(1)(A) of the Bankruptcy Code;

c.     Disallowing any claim or Sunstar or Collingwood may have against the Debtors;

d.     Requiring the payment of the Two Years Transfers to the Trustee; and

e.     Granting such other relief as is just and proper.

## COUNT II - FRAUDULENT TRANSFER
## PURSUANT TO SECTION 548(a)(1)(B) OF THE BANKRUPTCY CODE

79.     The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

80.     The Debtors received less than reasonably equivalent value in exchange for the Two Year Transfers, and;

a.      were insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations;

b.      were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or

c.      the Debtors intended to incur, or believed they would incur, debts that would be beyond their ability to pay as such debts matured.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a Judgment:

a.      Declaring the Two Year Transfers to have been fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code;

b.      Avoiding the Two Year Transfers as fraudulent transfers in violation of § 548(a)(1)(B) of the Bankruptcy Code;

c.      Disallowing any claim Sunstar or Collingwood may have against the Debtors;

d.      Requiring the payment of the Two Year Transfers to the Trustee; and

e.      Granting such other and further relief as may be just and proper..

**COUNT III – ACTION TO AVOID FRAUDULENT TRANSFER
PURSUANT TO SECTION 544 OF BANKRUPTCY CODE AND
SECTION 726.105(1)(a) OF THE FLORIDA STATUTES**

81.     The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

82.     The Debtors made Pre-petition transfers to Sunstar and Collingwood within the four year period prior to the Initial Petition Date and the Effective Petition Date ("Four Year Transfers"). The dates and amounts of the Four Year Transfers are contained in **Exhibits "A" and "B"** hereto.

83.     The Four Year Transfers constituted the transfer of an interest of the Debtors in property.

84.     The Four Year Transfers were made by the Debtors with the actual intent to hinder, delay or defraud a creditor of the Debtors.

85.     The Four Year Transfers may be avoided under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a judgment:

a.     Declaring the Four Year Transfers to have been fraudulent transfers in violation of Fla. Stat. § 726.105(1)(A);

b.     Avoiding the Four Year Transfers as fraudulent transfers in violation of Fla. Stat. § 726.105(1)(A);

c.     Requiring the payment of the Four Year Transfers to the Trustee;

d.     Disallowing any claim that Sunstar or Collingwood may have against the Debtors; and

e.     Granting such other and further relief as may be just and proper.

## COUNT IV - ACTION TO AVOID FRAUDULENT TRANSFERS
## PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE AND SECTION
## 726.105(1)(b) OF THE FLORIDA STATUTES

86.     The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

87.     Within the four year period preceding the Initial Petition Date and the Effective Petition Date, the Debtors made the Four Year Transfers.

88.     The Debtors received less than reasonably equivalent value in exchange for the Four Year Transfers, and

    a.     were engaged or were about to engage in business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to their business or transaction; or

    b.     intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as they became due.

89.     The Four Year Transfers may be avoided under Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a Judgment:

    a.     Declaring the Four Year Transfers to have been fraudulent transfers in violation of Fla. Stat. § 726.105(1)(B);

    b.     Avoiding the Four Year Transfers as fraudulent transfers in violation of Fla. Stat. § 726.105(1)(B);

    c.     Requiring the payment of the Four Year Transfers to the Trustee;

    d.     Disallowing any claim Sunstar or Collingwood may have against the Debtors; and

e.      Granting such other and further relief as may be just and proper.

**COUNT V – ACTION TO AVOID FRAUDULENT TRANSFER PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE AND SECTION 726.106(1) OF FLORIDA STATUTES**

90.      The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

91.      The Debtors made the Four Year Transfers without receiving reasonably equivalent value in exchange for the Four Year Transfers.

92.      The Debtors were insolvent at that times of the Four Year Transfers or became insolvent as a result of the Four Year Transfers, and a creditor(s) existed at the time of each of the Four Year Transfers.

93.      The Four Year Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes.

**WHEREFORE**, the Trustee respectfully requests that this Court enter a judgment:

a.       Declaring the Four Year Transfers to have been fraudulent transfers pursuant to Fla. Stat. § 726.106(1);

b.       Avoiding the Four Year Transfers as fraudulent transfers in violation of Fla. Stat. § 726.106(1);

c.       Requiring the payment of the Four Year Transfers to the Trustee;

d.       Disallowing any claim Sunstar or Collingwood may have against the Debtors; and

e.       Granting such other and further relief as may be just and proper.

**COUNT VI — AVOIDANCE OF POST-PETITION TRANSACTION
PURSUANT TO SECTION 549 OF THE BANKRUPTCY CODE**

94.     The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

95.     The Post-petition Transfer was made after the Effective Petition Date and constituted property of the Debtor's bankruptcy estate.

96.     The Post-petition Transfer was not authorized by the Bankruptcy Code or this Court.

**WHEREFORE**, the Trust respectfully requests that the Court enter a judgment:

a.     Declaring the Post-petition Transfer to Defendants to have been an unauthorized post-petition transaction pursuant to section 549 of the Bankruptcy Code;

b.     Avoiding the Post-petition Transfer as an unauthorized post-petition transaction pursuant to section 549 of the Bankruptcy Code;

c.     Disallowing any claim Defendants may have against the Debtors; and

d.     Granting such other relief as is just and proper.

**COUNT VII – RECOVERY OF PROPERTY PURSUANT TO SECTION 550 OF
THE BANKRUPTCY CODE**

97.     The Trustee realleges all of the allegations set forth in paragraphs 1 through 74 above, and incorporates those allegations by reference.

98.     The Pre-petition Transfers and Post-petition Transfer (collectively "Transfers") are avoidable by the Trustee pursuant to 11 U.S.C. §§ 544, 548, and 549 and, as a result, are recoverable by the Trustee pursuant to 11 U.S.C. § 550.

99.     Sunstar and/or Collingwood were the entities to whom or for whose benefit, the Transfers were made.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order:

a.    Directing Defendants to turn over the moneys transferred, plus reasonable attorneys' fees and expenses to the extent permissible by applicable law, to the Trustee; and

b.    Granting such other and further relief as may be just and proper.

Dated: August 21, 2014

BERGER SINGERMAN LLP
*Counsel for the Plaintiff/Trustee*
350 East Las Olas Blvd, Suite 1000
Fort Lauderdale, FL  33301
Telephone No.  (954) 525-9900
Facsimile No.  (954) 523-2872

By: */s/ Leslie Gern Cloyd*
      Leslie Gern Cloyd
      Florida Bar No. 303305
      lcloyd@bergersingerman.com
      Deborah B. Talenfeld
      Florida Bar No. 948004
      dtalenfeld@bergersingerman.com
      Zachary P. Hyman
      Florida Bar No. 98581
      zhyman@bergersingerman.com

5709344-3

# EXHIBIT A

## Transfers to Sunstar Financial LLC

| Account Number | Ledger Date | Recipient | Amount |
|---|---|---|---|
| TD-0052 | 05/21/10 | Sunstar Financial LLC | $ 100,000.00 |
| TD-0060 | 06/16/10 | Sunstar Financial LLC | 500,000.00 |
| TD-9740 | 06/21/10 | Sunstar Financial LLC | 24,000.00 |
| TD-0060 | 07/02/10 | Sunstar Financial LLC | 40,000.00 |
| TD-4946 | 09/09/10 | Sunstar Financial LLC | 300,000.00 |
| TD-9740 | 09/30/10 | Sunstar Financial LLC | 112,500.00 |
| TD-9740 | 10/07/10 | Sunstar Financial LLC | 162,500.00 |
| TD-9740 | 10/19/10 | Sunstar Financial LLC | 45,000.00 |
| TD-4946 | 12/23/10 | Sunstar Financial LLC | 120,000.00 |
| | | **Sunstar Financial LLC Total** | **$ 1,404,000.00** |

# EXHIBIT B

GLUCK

| Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 09.13.2012 | Incoming wire | | $ 156,371.81 | $ 156,371.81 |
| 09.13.2012 | Incoming wire fee | $ 14.00 | | $ 156,357.81 |
| 09.27.2012 | Outgoing wire to Peck | $100,000.00 | | $ 56,357.81 |
| 09.27.2012 | Outgoing wire fee | $ 30.00 | | $ 56,327.81 |
| 09.14.2012 | Outgoing wire to Sunstar | $ 55,547.81 | | $ 780.00 |
| 09.14.2012 | Outgoing wire fee | $ 30.00 | | $ 750.00 |
| 09.14.2012 | trans to Law Office AMF fee | $ 750.00 | | $ - |
| | | | | $ |

ROSENBERG

| Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 11.01.2012 | Incoming wire | | $ 435,732.94 | $ 435,732.94 |
| 11.01.2012 | Incoming wire fee | $ 14.00 | | $ 435,718.94 |
| 11.02.2012 | Outgoing wire for Sunstar | $ 30,000.00 | | $ 405,718.94 |
| 11.02.2012 | Outgoing wire fee | $ 30.00 | | $ 405,688.94 |
| 11.02.2012 | Outgoing wire to Sunstar | $146,250.00 | | $ 259,438.94 |
| 11.02.2012 | Outgoing wire fee | $ 30.00 | | $ 259,408.94 |
| 11.02.2012 | trans to Law Office AMF fee | $ 3,750.00 | | $ 255,658.94 |
| 11.09.2012 | Wire from Sunstar | | $ 30,074.00 | $ 285,732.94 |
| 11.09.2012 | Incoming wire fee | $ 14.00 | | $ 285,718.94 |
| 09.04.2013 | Trans to Law Office – Peck 08-2013 billing | $ 1,805.05 | | $ 283,913.89 |
| 02.26.2014 | Cashier's check to Deborah C. Menotte, Trustee | $283,913.89 | | $ - |
| | | | | $ - |

# EXHIBIT C

**Transfers to Sunstar Financial LLC**
**Two Year Transfers**

Petition Date: August 22, 2012
Two Year Period: August 22, 2010 through August 22, 2012

| Account Number | Ledger Date | Recipient | Amount |
|---|---|---|---|
| TD-4946 | 09/09/10 | Sunstar Financial LLC | $    300,000.00 |
| TD-9740 | 09/30/10 | Sunstar Financial LLC | 112,500.00 |
| TD-9740 | 10/07/10 | Sunstar Financial LLC | 162,500.00 |
| TD-9740 | 10/19/10 | Sunstar Financial LLC | 45,000.00 |
| TD-4946 | 12/23/10 | Sunstar Financial LLC | 120,000.00 |
| | | **Sunstar Financial LLC Total** | **$    740,000.00** |